Argued and submitted June 20, 2005; resubmitted en banc June 7, affirmed by equally divided court July 26, petition for review allowed December 5, 2006 (342 Or 116)

Jerome E. BAILEY,
*Appellant,*

*v.*

LEWIS FARM, INC.,
an Oregon corporation,
and PACCAR, Inc.,
a Delaware corporation,
dba Kenworth Motor Truck Co.,
*Defendants,*

*and*

MAY TRUCKING CO., INC.,
an Idaho corporation,
*Respondent.*

0211-11957; A124145

139 P3d 1014

Gerald C. Doblie argued the cause for appellant. With him on the briefs was Doblie & Associates.

Gordon T. Carey, Jr., argued the cause and filed the brief for respondent.

Before Brewer, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Schuman, Ortega, and Rosenblum, Judges.

PER CURIAM

Ortega, J., concurring.

Haselton, J., dissenting.

Armstrong, J., dissenting.

Rosenblum, J., dissenting.

**ORTEGA, J.,** concurring.

Plaintiff appeals the dismissal under ORCP 21 A(8) of his claim for negligence against defendant May Trucking Company (May). The sole issue is whether plaintiff pleaded a viable negligence claim against May under the "general foreseeability" analysis of *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987). We affirm by an equally divided court, and I write separately to explain why I concur in that result.

For purposes of reviewing a trial court's order of dismissal pursuant to ORCP 21 A(8), we accept all of the facts alleged in the complaint as true and give plaintiff the benefit of all reasonable inferences that may be drawn from the facts alleged. *Brewer v. Dept. of Fish and Wildlife*, 167 Or App 173, 176, 2 P3d 418 (2000), *rev den*, 334 Or 693 (2002). Plaintiff alleged that, while he was driving westbound on Oregon State Highway 6 in November 2000, a Kenworth tractor-trailer unit heading in the opposite direction lost its left rear axle assembly, causing the dual wheels and tires to come off, bounce across the highway, and collide with the tractor-trailer unit that plaintiff was driving. Plaintiff's vehicle then careened down an embankment and became engulfed in flames, causing serious injuries to plaintiff.

Plaintiff filed a negligence action against three defendants: the owner of the Kenworth, its manufacturer, and May, a prior owner.[1] May had sold the Kenworth to a nonparty a year before the accident, and the Kenworth had changed hands at least once more after that sale. The pertinent allegations in plaintiff's complaint against May are as follows:

---

[1] Among other things, plaintiff alleged that the present owner's employee, acting in the course and scope of employment, operated the Kenworth in a negligent manner and that the owner was negligent "[i]n failing to regularly and properly inspect the axle assembly to discover loose attachments" and "failing to maintain the truck so it was safe to operate[.]" He further alleged, as to the manufacturer, that the design of the Kenworth was defective. Plaintiff's claims against those defendants were dismissed (a voluntary dismissal with prejudice followed settlement of his claims against the present owner, and dismissal of the claims against the manufacturer followed its unopposed motion for summary judgment). Plaintiff's appeal concerns only his claim against May.

"27.

"[May] was the owner of the Kenworth * * * prior to its being purchased by [the current owner]. May purchased the Kenworth * * * when it was new or nearly new, and owned it until selling it in or about November, 1999. The truck was then owned by other non-parties prior to being sold to [the current owner] in or about January, 2000. During the time May * * * owned the truck, it was driven in excess of 500,000 miles.

"28.

"On or about August 8, 1997, maintenance work was performed on the rear axle shaft and the drive axle on the Kenworth * * *, involving one or more spindle nuts.

"29.

"The manufacturer of the Kenworth * * * provided a manual with the vehicle which recommended the following maintenance of the rear axle assembly and bearings:

"a) That the bearings be cleaned and repacked every 25,000 miles; and

"b) That every 100,000 miles, the bearings be disassembled, cleaned, inspected and refilled or repacked with clean lubricant; the bearing play be readjusted; and the rear axle flange nuts be torqued.

"30.

"[May] was negligent in failing to follow the manufacturer's recommendations regarding maintenance of the rear axle assembly and bearings, in that May * * * failed to perform any of the recommended services during more than 500,000 miles of use. As a result of this failure, the condition of the rear axle assembly and bearings deteriorated, which deterioration was a substantial contributing cause of the failure of the rear axle as described above, and of plaintiff's damages.

"31.

"[May] was negligent in maintaining the truck in that any maintenance to the rear axle shaft and/or drive axle failed to result in a truck that was safe to operate."

A necessary starting point for any discussion of the sufficiency of a complaint in a negligence case is the Supreme

Court's *Fazzolari* decision. There, the court imparted the following formulation of the circumstances in which Oregon law imposes liability on a defendant for harm caused by its conduct:

"[U]nless the parties invoke a status, a relationship, or a particular standard of conduct that creates, defines, or limits the defendant's duty, the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff."

303 Or at 17. As that passage indicates, if the plaintiff invokes a special status, relationship, or standard of conduct, then that relationship may create, define, or limit the defendant's duty to the plaintiff. *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 340-41, 83 P3d 322 (2004). In the absence of a special status, relationship, or standard that sets the scope of a defendant's duty to a plaintiff, liability for harm that a defendant's conduct causes another is analyzed in terms of the concept of "reasonable foreseeability," *id.* at 340, or "general foreseeability," *Slogowski v. Lyness*, 324 Or 436, 441, 927 P2d 587 (1996). Either formulation—duty or foreseeability—describes how the law limits the circumstances and conditions under which one member of society may expect another to pay for a harm suffered. *Oregon Steel Mills, Inc.*, 336 Or at 342.

In this case, because plaintiff did not plead a special status, relationship, or standard of conduct, I inquire into reasonable foreseeability—that is, whether plaintiff has pleaded facts indicating a foreseeable risk of harm to plaintiff and conduct by May that was unreasonable in light of that risk. *See id.* at 340.

Whether an injury is reasonably foreseeable generally presents an issue of fact and, therefore, is not typically resolvable on a motion to dismiss. *See generally Cunningham v. Happy Palace, Inc.*, 157 Or App 334, 337, 970 P2d 669 (1998), *rev den*, 328 Or 365 (1999). However, there are some circumstances where we will conclude, as a matter of law, that no reasonable factfinder could find that the harm that befell the plaintiff was a reasonably foreseeable consequence

of the defendant's conduct. *See Hefty v. Comprehensive Care Corporation*, 307 Or 247, 253, 766 P2d 1026 (1988) (concluding as a matter of law that the minor plaintiff's injuries in a motorcycle accident were not a reasonably foreseeable consequence of the defendant alcohol treatment provider's conduct of discharging the plaintiff against medical advice and failing to notify her parents of her discharge). In order to state a negligence claim under principles of general foreseeability, the plaintiff's complaint must allege facts affording a reasonable factfinder a basis for determining

> " '(1) that [the] defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that [the] defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that [the] plaintiff was within the class of persons and [the] plaintiff's injury was within the general type of potential incidents and injuries that made [the] defendant's conduct negligent.' "

*Slogowski*, 324 Or at 441 (quoting *Solberg v. Johnson*, 306 Or 484, 490-91, 760 P2d 867 (1988)).

*Oregon Steel Mills, Inc.*, provides a recent example of circumstances where the Supreme Court concluded that no reasonable factfinder could find that the harm that befell the plaintiff was a reasonably foreseeable consequence of the defendant's conduct. There, the plaintiff steel company was planning to make a public offering of its stock and debt. 336 Or at 333. Because of the need to correct the defendant accounting firm's errors in financial statements filed with the SEC, the offering was delayed for about a month. *Id*. Over the course of that month, the price of the stock declined—and the plaintiff then sought to recover the difference between the price it actually received for the stock and the price it would have received on the earlier date, that is, the date the stock would have issued but for the defendant's negligence. *Id*. at 333-34.

The Supreme Court concluded that the decline in stock price was, as a matter of law, not reasonably foreseeable, so the defendant could not be liable for damages based on that decline. *Id*. at 348. The court explained that, even

though the defendant's conduct caused the delay in the offering that in turn led to an adverse result for the plaintiff, "the intervening action of market forces on the price of [the] plaintiff's stock was the 'harm-producing force[.]' "[2] *Id.* at 345. In the court's view, "[the] defendant's actions did not 'cause' the decline in the stock price so as to support liability for that decline." *Id.* Accordingly, "As a matter of law, the risk of a decline in [the] plaintiff's stock price * * * was not a reasonably foreseeable consequence of [the] defendant's negligent acts * * *." *Id.*

The court noted parallels between that case and a prior decision, *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993). *Oregon Steel Mills, Inc.*, 336 Or at 344-45. In *Buchler*, the court held, as a matter of law, that a prison escapee's crimes committed two days after his escape were not reasonably foreseeable consequences of a prison employee's failure to remove the keys from the prison van in which the inmate escaped. 316 Or at 511-12. The court explained that an "intervening criminal instrumentality caused the harm and created the risk" in *Buchler*:

> "While it is generally foreseeable that criminals may commit crimes and that prisoners may escape and engage in criminal activity while at large, that level of foreseeability does not make the criminal's acts the legal responsibility of everyone who may have contributed in some way to the criminal opportunity."

316 Or at 511. It was the intervening intentional criminality of another person that was the "harm-producing force" in *Buchler*; accordingly, despite the fact that leaving the keys in the van facilitated the harm, that act "[did] not cause the harm so as to support liability for it." *Id.* at 511-12.

*Oregon Steel Mills, Inc.*, and *Buchler* illustrate two related principles underlying the determination of when liability may be imposed based on general foreseeability. First,

---

[2] The court identified an "intervening action" (market forces) that constituted the " 'harm-producing force[.]' " 336 Or at 345. For brevity's sake, we refer to that limiting concept as "intervening harm-producing force." I do not understand the Supreme Court to have intended to refer to the similarly named concept of "superseding cause." Contrary to the analysis in Judge Haselton's dissent, therefore, passages of the *Restatement (Second) of Torts* addressing "superseding cause" are not helpful to understanding the principles discussed in *Oregon Steel Mills, Inc.*

the fact that a defendant's conduct created a risk of harm that was literally foreseeable is not enough to support the imposition of liability for that harm. In *Oregon Steel Mills, Inc.*, it was literally foreseeable that the accounting error could delay the offering, resulting in a drop in price due to market fluctuations, because "it is common knowledge that stock prices fluctuate." 336 Or at 336, 344. In *Buchler*, it was literally foreseeable that leaving the keys in a vehicle in the vicinity of prisoners created a risk that a prisoner would escape and engage in criminal activity while at large. 316 Or at 511. In both cases, despite the literal foreseeability of the harm that materialized, the court held that liability could not be imposed as a matter of law. Its conclusions in both cases reflect a recognition that "[a]lmost all harm is foreseeable, even though it occurred through some strange concatenation of events." *Id.* at 522 (Peterson, J., concurring). The critical question is whether the harm that materialized was a *reasonably* foreseeable consequence of the defendant's conduct.

The second, but related, principle underlying the determination of when liability may be imposed based on general foreseeability is the need to consider the role of intervening actions or events in producing the harm. In *Oregon Steel Mills, Inc.*, market forces intervened to become the "harm-producing force" that led to the plaintiff's losses; in *Buchler*, the prisoner's criminal acts likewise intervened. The court in both cases noted that, although those intervening instrumentalities were predictable, they did not find their impetus in the defendant's negligent actions. *Oregon Steel Mills, Inc.*, 336 Or at 344 (noting that the price decline affected all steel stocks and was itself "unrelated to [the] defendant's misconduct"); *Buchler*, 336 Or at 512 (noting that the vehicle with the keys left in it was not "the mechanism by which the escaped prisoner inflicted the harm; rather, it was merely one of [several] means by which an escape was * * * equally possible"). Market forces were seen to have an independent impetus in *Oregon Steel Mills, Inc.*, as did the criminal actions of the escapee in *Buchler*.[3]

---

[3] Judge Armstrong, in his dissent, asserts that *Oregon Steel Mills, Inc.*—despite *Buchler*—is an "anomaly" with a much more limited reach, confined only to "*the realm of securities and similar market transactions.*" 207 Or App at 133-37

We return to plaintiff's claim against May. Plaintiff alleges that May failed to perform recommended maintenance of the rear axle assembly and bearings of the Kenworth, causing them to deteriorate and that, ultimately, that deterioration was a "substantial contributing cause" of the accident that injured plaintiff. However, the complaint also alleges that, between May's alleged negligent conduct and the accident, the Kenworth had been sold not once, but twice, and that May had not owned the Kenworth for a year. Under those circumstances, I would conclude that the injuries to plaintiff were not a reasonably foreseeable consequence of May's alleged failure to maintain the Kenworth as a matter of law.[4]

Despite the paucity of case law on the subject in Oregon, we have little trouble recognizing that, under some circumstances, a vehicle owner's failure to maintain a vehicle may cause a reasonably foreseeable risk of harm to other drivers that could form a basis for liability for resulting injuries. Indeed, the Oregon Vehicle Code recognizes that risk by imposing penalties for driving an unsafe vehicle.[5] However,

---

(Armstrong, J., dissenting) (emphasis in original). However, I find no indication in the opinion itself that the Supreme Court intended its reach to be so limited. Indeed, although the court discussed the defendant's "loss causation" arguments, its decision was grounded in the "significant parallels" between *Oregon Steel Mills, Inc.* and *Buchler. Oregon Steel Mills, Inc.*, 336 Or at 344.

[4] I express no opinion regarding the sufficiency of a complaint in which, for example (as in Judge Haselton's hypothetical, 207 Or App at 127 (Haselton, J., dissenting)), a plaintiff alleges that a former owner concealed a known defect or that the former owner had sold the vehicle so recently that the current owner had no real opportunity to inspect or repair the vehicle. Although Judge Haselton expresses concerns about cases in which a seller might fail to disclose a previous failure to maintain, 207 Or App at 124, 127 (Haselton, J., dissenting), this case simply does not involve such circumstances. Plaintiff makes no allegation that May concealed or failed to inform the nonparty to whom it sold the Kenworth of the vehicle's prior maintenance record. In fact, in response to May's motion to dismiss, plaintiff noted that this case does not involve "a failure to warn[; r]ather, plaintiff's cause of action against May is a failure to maintain or repair." Under plaintiff's theory of the case, a seller must repair a vehicle before selling it (regardless of any disclosures made about the vehicle's condition) or else face liability for any injury that may result to anyone from the vehicle's condition, long after the sale is complete and regardless of the new owner's negligence in maintaining or operating the vehicle or assessing its roadworthiness. Oregon negligence law does not support that result.

[5] ORS 815.020 provides:

"(1) A person commits the offense of operation of an unsafe vehicle if the person does any of the following:

once ownership and control of the vehicle have been relinquished, the prior owner loses the ability to make an ongoing determination of whether the vehicle is safe to drive. That ongoing determination can be made only by those exercising ownership and control over the vehicle. Here, May lost that ability *an entire year before the accident*, and the vehicle had been in the hands of *two subsequent owners* during that year. Under the circumstances alleged, negligent maintenance of a vehicle during a prior period of ownership, without more, cannot form the basis for liability for injuries that occur a year after that prior owner has relinquished the ability to assess and control the vehicle's roadworthiness. Although one can imagine circumstances in which such injuries would be literally foreseeable by the prior owner, they would not be reasonably foreseeable.

That is so because the actions of those who drive and maintain a vehicle at the time of an accident—those who exercise the ability, to the extent possible, to assess the vehicle's roadworthiness—form the intervening harm-producing force behind any injuries that result from the unsafe condition of the vehicle.[6] Although it is literally foreseeable that later owners or drivers may fail to ensure that a vehicle is in a safe condition before driving it, that level of foreseeability does not make the condition of the vehicle the legal responsibility of all prior owners who may have contributed in some

---

"(a) *Drives or moves on any highway* any vehicle which is in such unsafe condition as to endanger any person.

"(b) *Owns* a vehicle *and causes or knowingly permits* the vehicle to be driven or moved on any highway when the vehicle is in such unsafe condition as to endanger any person.

"(2) The offense described in this section * * * is a Class B traffic violation."

(Emphasis added.)

[6] Judge Haselton contends that May's negligent failure to maintain the axle was the "harm-producing force," equivalent to the stock market decline in *Oregon Steel Mills, Inc.*, 207 Or App at 126 (Haselton, J., dissenting). However, failing to maintain a vehicle, unless or until that vehicle is operated, generally will not create a risk of harm to drivers or passengers in other vehicles. It is the *operation* of an unsafe vehicle, not the mere failure to maintain the vehicle, that creates a risk that accidents will occur. Here, May had sold the vehicle to a nonparty and thus had lost any ability to control the vehicle's maintenance and operation over a year before plaintiff was injured. The force that produced harm to plaintiff was the defendant-owner's maintenance and operation of the Kenworth; indeed, plaintiff's complaint specifically alleges as much.

way to the vehicle's state of repair. *Cf. Buchler*, 316 Or at 511 ("While it is generally foreseeable * * * that prisoners may escape and engage in criminal activity while at large, that level of foreseeability does not make the criminal's acts the legal responsibility of everyone who may have contributed in some way to the criminal opportunity.").

Contrary to Judge Haselton's suggestion, 207 Or App at 123, 124, 127 (Haselton, J., dissenting), my holding would not support the proposition that the "mere transfer of ownership" relieves a negligent prior owner from liability. The critical fact is not merely the transfer of title; rather, defendant here is relieved of liability under the facts alleged because the title was transferred a year before the accident, long after defendant could have exercised any ability to make the ongoing determination that the vehicle was safe to drive, and because no other facts are alleged to support a finding that the later owner's actions in operating the vehicle in its current condition were somehow attributable to actions of defendant. Contrary to Judge Haselton's concerns that I am somehow "chart[ing] a new legal course," 207 Or App at 127 (Haselton, J., dissenting), actually the opposite is true; we have found no precedent for treating allegations such as are stated here to be sufficient to state a claim for negligence.[7] Indeed, given the difficulty of insuring against potential claims for injuries occurring years after selling a vehicle but alleged to be the result of negligent maintenance of a vehicle during a prior period of ownership, the implications of the dissenting opinions are troubling.[8]

---

[7] Decisions from other jurisdictions have disallowed claims similar to the one alleged by plaintiff. *Stapinski v. Walsh Constr. Co., Inc.*, 272 Ind 6, 395 NE2d 1251 (1979) (affirming summary judgment against the plaintiff in a negligence action against the prior owner of a vehicle sold 15 months earlier); *Bruce v. Martin-Marietta Corp.*, 544 F2d 442 (10th Cir 1976) (affirming summary judgment against the plaintiff in a negligence action against the prior owner of an airplane sold three years earlier).

[8] Judge Armstrong opens with the suggestion that we are engaged in "free-wheeling judicial policy declarations and thinly disguised value judgments[,]" 207 Or App at 128 (Armstrong, J., dissenting) (internal quotation marks omitted), yet closes with the blithe observation that May could yet defeat plaintiff's claim on summary judgment. However (leaving aside the serious question of whether summary judgment would be any more attainable than dismissal on the pleadings under Judge Armstrong's view of Oregon negligence law), allowing claims such as this one to proceed to litigation, even to the summary judgment stage, is not a value-neutral decision. Our opinion is, at least, consistent with the division of

Plaintiff has not alleged facts that would support a finding that his injuries, occurring a year after May last exercised any control over the Kenworth and while the Kenworth was in the possession of an owner with whom May had had no contact, were a reasonably foreseeable consequence of May's alleged ongoing failure to maintain the Kenworth during May's prior period of ownership.

For the reasons stated above, the proper disposition of this appeal is to affirm the trial court.

Brewer, C. J., Edmonds, Landau, and Linder, JJ., join in this concurrence.

**HASELTON, J.,** dissenting.

This is a difficult and provocative case. Nothing touching on *Fazzolari* is easy, *see, e.g., Bertram v. Malheur County*, 204 Or App 129, 129 P3d 222 (2006), and the concurring judges have striven admirably. Nevertheless, the concurrence's analysis, especially with respect to "intervening" causation, cannot be squared with *Fazzolari*, with implications far transcending the present dispute. Accordingly, I respectfully dissent.

My concerns are both legal and practical. As a legal matter, as I understand the concurring opinion's core holding, the mere transfer of ownership and exercise of control over a negligently maintained vehicle operates as an "intervening cause," relieving the seller/prior owner of any liability for the consequences of that negligence.[1] That is so (1) even if

responsibility for safe operation of a vehicle contained in the Oregon statutes and with case law from other jurisdictions. Judge Armstrong points to no authority beyond his reading of the case law as support for his own view, with its attendant and serious consequences. In any event, whatever the relevant merit of the positions expressed by this opinion and the dissenting opinions may be, no one can lay claim to have avoided the "policy-making journey" decried by Judge Armstrong.

[1] The concurrence reasons as follows:

"[O]nce ownership and control of the vehicle have been relinquished, the prior owner loses the ability to make an ongoing determination of whether the vehicle is safe to drive. That ongoing determination can be made only by those exercising ownership and control over the vehicle. Here, May lost that ability *an entire year before the accident*, and the vehicle had been in the hands of *two subsequent owners* during that year. Under the circumstances alleged, negligent maintenance of a vehicle during a prior period of ownership, without more, cannot form the basis for liability for injuries that occur a year after that prior owner has relinquished the ability to assess and control the vehicle's

the subsequent accident/injury is precisely the sort that would be expected to flow from the negligent maintenance; and (2) regardless of whether the seller disclosed the defective/negligently maintained condition of the vehicle to the buyer, or the buyer was otherwise reasonably alerted to that condition.

Thus, under the concurrence's reasoning, even though the accident may be the quintessentially reasonably foreseeable product of the negligent nonmaintenance, the buyer's *passive* failure to remedy the continuing consequences of the seller's negligence constitutes "intervening cause," effectively immunizing the negligent seller, *even when the buyer does not know of that condition*. In other words, the buyer's failure to remedy an antecedent "defect" is deemed to cut off the chain of reasonably foreseeable causation, excusing the original, incontrovertible negligence, *merely because the vehicle was sold*.

Such an expansive view of "intervening" (or "superseding")[2] causation is unprecedented. Certainly, *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993), which the concurrence invokes, does not suggest that the concept is so pliable.

Rather, the law of superseding causation is to the contrary. The applicable legal principles are summarized in sections 440 to 453 of the *Restatement (Second) of Torts*. Particularly pertinent is section 442B:

---

roadworthiness. Although one can imagine circumstances in which such injuries would be literally foreseeable by the prior owner, they would not be reasonably foreseeable.

"That is so because the actions of those who drive and maintain a vehicle at the time of an accident—those who exercise the ability, to the extent possible, to assess the vehicle's roadworthiness—form the intervening harm-producing force behind any injuries that result from the unsafe condition of the vehicle."

207 Or App at 121 (Ortega, J., concurring) (footnote omitted; emphasis in original).

[2] *Restatement (Second) of Torts* § 440 (1965) defines "superseding cause" as follows:

"A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."

"Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, *except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct.*"

(Emphasis added.) Thus, as a matter of law, nonintentional tortious conduct (*e.g.*, active or passive negligence) cannot be deemed superseding cause. Instead, there can be no preclusion of the original actor's tort liability for reasonably foreseeable harm unless, as in *Buchler*, there is *intentional* conduct that gives rise to a harm "not within the scope of the risk created by the actor's conduct." *See also Restatement* at § 442B comment c (addressing application of exception for "[i]ntentionally tortious or criminal acts").

Here, there can be no question that the accident that injured plaintiff was within the reasonably foreseeable "scope of the risk created by [defendant's] conduct." An accident resulting from axle failure is the quintessential reasonably foreseeable consequence of negligent nonmaintenance of a truck's axles.[3] That alone renders superseding cause inapposite to this case. Further, and in all events, nothing in the pleadings discloses intentionally tortious or criminal conduct by the subsequent actors. In sum, the pleadings here do not disclose either of the conjunctive requirements for invocation of superseding causation.

The concurrence's countervailing reliance on *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 83 P3d 322 (2004), is misplaced. Indeed, *Oregon Steel Mills, Inc.*, contradicts the concurrence's analysis and disposition. In

---

[3] That understanding of reasonable foreseeability was well established in Oregon law long before *Fazzolari*:

"The specific question before us is, then, whether plaintiff's injury and the manner of its occurrence was so highly unusual that we can say as a matter of law that a reasonable man, making an inventory of the possibilities of harm which his conduct might produce, would not have reasonably expected the injury to occur. Stated in another way, the question is whether the circumstances are out of the range within which a jury could determine that the injury was reasonably foreseeable."

*Stewart v. Jefferson Plywood Co.*, 255 Or 603, 609-10, 469 P2d 783 (1970).

*Oregon Steel Mills, Inc.*, the Supreme Court, in analyzing whether the harm for which the plaintiff sought to recover was the reasonably foreseeable consequence of the defendant's conduct, focused on whether the defendant's conduct was the "harm-producing force":

> "[I]n this case, [the] defendant's conduct caused the delay in the offering that led to an 'unintended adverse result.' However, the intervening action of market forces on the price of plaintiff's stock was the 'harm-producing force,' and defendant's actions did not 'cause' the decline in the stock price so as to support liability for that decline. As a matter of law, the risk of a decline in [the] plaintiff's stock price in June 1996 was not a reasonably foreseeable consequence of [the] defendant's negligent acts in 1994 and early 1995."

*Id.* at 345.

Here, assuming the truth of the pleadings, defendant's negligence in failing to maintain the axle was the "harm-producing force." Unlike in *Oregon Steel Mills, Inc.*, where the defendant's negligent delay merely put the plaintiff in "the wrong place at the wrong time" to be injured by intervening market forces over which the defendant had no control, in this case, the failure of the axle that defendant had negligently failed to maintain *caused*—there is no more descriptive term—the accident that injured plaintiff. Unlike in *Buchler*, where the defendant's negligence in leaving the keys in the van merely facilitated the third party's independent and qualitatively different superseding criminal conduct, defendant's negligence here directly precipitated that accident.

A rhetorical question: If an accident involving axle failure had occurred while defendant owned the Kenworth, there would be no question that defendant's negligent non-maintenance would be deemed the "harm-producing force"—or, at least, that a jury could so find. How or why, then, does the mere change of ownership transmute a "harm-producing force" into a non-"harm-producing force"? Even more, how does the passive failure to rectify defendant's conduct render it any less "harm-producing"? Neither *Oregon Steel Mills, Inc.*, nor *Buchler* sanctions, much less compels, such a result.

Beyond all of that, even if the court were otherwise inclined to chart a new legal course, the procedural posture precludes outright dismissal. This case is before us on a Rule 21 dismissal, and, except in "bright line" cases like *Buchler* or *Oregon Steel Mills, Inc.*, "foreseeability" is properly committed to the trier of fact—or, at the very least, disposition on that basis should await development of an evidentiary record. *See, e.g.*, *Fireman's Fund v. Pacific Power*, 269 Or 421, 432, 525 P2d 157 (1974) ("[T]he question of intervening or superseding cause is ordinarily a question of fact[.]"); *Knepper v. Brown*, 182 Or App 597, 623, 50 P3d 1209 (2002) (noting that to extend *Buchler* to intervening, merely negligent conduct "would abrogate the well-established rule that 'the negligence of a third person is not unforeseeable as a matter of law'") (quoting *Becker v. Barbur Blvd. Equipment Rentals, Inc.*, 81 Or App 648, 653, 726 P2d 967 (1986), *rev den*, 303 Or 535 (1987)).[4]

Finally, the concurrence's "intervening cause" analysis has profound, and incongruous, consequences. A hypothetical:

A, who has never had his 2001 Toyota's brakes serviced (violating every standard of reasonable conduct), sells his car to B and tells her nothing about the brakes. As B drives the Toyota home from A's house, the brakes fail, causing B (a notoriously careful driver) to hit C, who is in a crosswalk. C sues A and B for negligence.

C cannot recover against B because she did not breach any standard of care. Nor—if the proposed opinion stands—can C recover against A. The upshot is that, merely because of the sale of the vehicle, the risk of loss is, as a matter of law, transferred from the negligent seller (A) to the innocent victim (C).[5]

---

[4] *See also Link v. Massie, Slate*, 277 Or 715, 720-21, 561 P2d 634 (1977) (citing with approval *Restatement* § 440's formulation of "superseding cause" and concluding that that question was for the jury).

[5] Note, further, that that result would almost certainly still hold even if the seller fraudulently misrepresents the car's condition to the buyer, who reasonably detrimentally relies on those representations: The victim (as in the hypothetical) could not recover in negligence against the buyer and could not recover in fraud against the seller (because the seller made no representations to the victim).

In the end, I can appreciate the misgivings about *Fazzolari* and "policy" concerns about the exposure of sellers of vehicles that may drive, and inform, the concurrence's approach. But we cannot "get there from here." This case should be remanded to the trial court.

Armstrong and Schuman, JJ., join in this dissent.

**ARMSTRONG, J.,** dissenting.

I write separately to elaborate further on the concurrence's departure from the established negligence law of this state and its reliance on a wholly inapposite opinion, specifically *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 83 P3d 322 (2004).

The concurrence purports to start its analysis, as it should, from the rule in *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 734 P2d 1326 (1987). However, it very rapidly departs from the *Fazzolari* analysis and, as Judge Haselton astutely observes, "chart[s] a new legal course." 207 Or App at 127 (Haselton, J., dissenting). As I explain below, that new legal course takes us to a critical juncture at which we must decide whether to continue to apply the *Fazzolari* analysis or to pay only lip service to it and cloak otherwise prohibited "freewheeling judicial 'policy declarations' " and thinly disguised value judgments in the language of the *Fazzolari* framework. *Donaca v. Curry Co.*, 303 Or 30, 36, 734 P2d 1339 (1987).

To understand how far astray the concurrence would lead us, it is useful to look back at how we arrived at this juncture. In the classic, black-letter negligence formula—duty, breach, causation, damage—the courts have two points in the analysis at which they can act as lawmakers in delimiting the boundaries of a defendant's liability to a plaintiff. First, a court could conclude that the defendant's conduct was not the proximate, or legal, cause of the plaintiff's damages. Second, a court could conclude that the defendant owed the plaintiff no duty to protect him or her from whatever harm befell him or her.[1]

---

[1] Some commentators and courts have suggested, probably correctly, that those two opportunities for the judiciary to make law are in fact one opportunity

Those two opportunities for judicial lawmaking do not exist in Oregon negligence law, and have not existed for nearly 20 years. Rather, under Oregon negligence law, the question whether a defendant is liable to a plaintiff in negligence presents factual questions for the jury, unless the court can articulate why no reasonable factfinder could conclude that the plaintiff's injury was reasonably foreseeable or that the defendant had acted unreasonably. Two landmark cases made that so.

First, in *Stewart v. Jefferson Plywood Co.*, 255 Or 603, 606, 469 P2d 783 (1970), the Supreme Court took proximate cause off the table. After *Stewart*, there is but one question about causation, and it is a factual one—did "defendant's conduct in fact contribute[ ] to the events that harmed the plaintiff, as cause and effect might be described outside any legal context." *Fazzolari*, 303 Or at 14; *see also Oregon Steel Mills, Inc.*, 336 Or at 340 ("This court has rejected the use of the traditional concept of proximate or legal cause * * *. A plaintiff, of course, still must prove 'factual' or 'but-for' causation—that there is a causal link between the defendant's conduct and the plaintiff's harm[.]"). Where, as in this case, the plaintiff alleges that the defendant's negligence caused the plaintiff's harm, the court cannot dismiss the complaint on a Rule 21 motion on causation bases, for it must take the facts as alleged by the plaintiff to be true, and if true, causation for purposes of Oregon negligence law has been established.

Second, *Fazzolari* took the defensive "no duty as a matter of law" argument off the table. *Fazzolari*, 303 Or at 11-17. In *Donaca*—episode three in the *Fazzolari* trilogy—the court explained that

> "broadly phrased arguments over 'duty' in common-law negligence tend to turn into a disputed rule of law what properly is a determination of the ordinary issues of negligence liability: whether defendant's conduct caused a foreseeable kind of harm to an interest protected against that

simply to say that the defendant should not be liable for the plaintiff's damages. *See, e.g., First Fed. Sav. v. Charter Appraisal Co., Inc.*, 247 Conn 597, 604 n 7, 724 A2d 497, 502 n 7 (1999) (citing W. Page Keeton, *Prosser and Keeton on Torts* § 42, at 274 (5th ed 1984)).

kind of negligent invasion, and whether the conduct creating the risk of that kind of harm was unreasonable under the circumstances. The existence and magnitude of the risk [in the particular circumstances] bear on the foreseeability of harm. The feasibility and cost of avoiding the risk bear on the reasonableness of defendant's conduct. Both clearly are empirical questions. We do not mean that they must in every case be submitted to a jury; in an extreme case a court can decide that no reasonable factfinder could find the risk foreseeable or defendant's conduct to have fallen below acceptable standards."

303 Or at 38-39. The court phrased it another way in *Fazzolari*: "As far as 'negligence' rests on a standard of reasonable conduct, the issue ordinarily can be left to the jury, although[,] at the outer margins of debatable conduct[,] a court is obliged to say 'that the conduct does or does not meet the standard.' " 303 Or at 12 (quoting *Stewart*, 255 Or at 608). In sum, after *Fazzolari*, in run-of-the-mill negligence cases, Oregon courts could no longer simply say that defendant owed "no duty" to plaintiff; rather, in order to keep the case from the jury, the court would have to be able to articulate why no reasonable factfinder could determine that the risk was foreseeable or that the defendant's conduct was unreasonable.

The court did just that in the landmark case of *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993). In *Buchler*, the court concluded that no reasonable factfinder could determine that the plaintiffs' gunshot injuries, inflicted on them by an escaped fugitive with a gun stolen from the fugitive's mother, were the reasonably foreseeable consequences of the defendant's failure to remove the keys from the ignition of a vehicle in which it had transported the fugitive. The fugitive was a minimum security prisoner who was transported to a forest work camp in the defendant's van. The fugitive had no prior history of violence. The facts in *Buchler* presented the "extreme case" discussed in *Donaca*, in which the court could conclude, without the intervention of a jury, that the plaintiffs' injuries were not reasonably foreseeable as a matter of law. The injuries were simply too attenuated or unexpected.

*Buchler* was hailed by some as *Fazzolari*'s death knell. *See, e.g.*, Kenneth J. O'Connell, *A Postmortem Footnote Upon the Demise of the* Fazzolari *Error*, 72 Or L Rev 933, 933 (1993) ("The decision in *Buchler v. Oregon Corrections Division* was a heartening event for those of us in the legal profession in Oregon who have looked upon the so-called '*Fazzolari* triad' as an abomination in the development of negligence law in Oregon." (Footnote omitted.)). Although *Buchler* did expressly overrule *Kimbler v. Stillwell*, 303 Or 23, 734 P2d 1344 (1987)—episode two in the *Fazzolari* trilogy—the *Fazzolari* framework emerged only bent, not broken, after *Buchler*. Indeed, as explained above, *Buchler* is wholly consistent with the rest of the *Fazzolari* trilogy, which acknowledged that not all negligence cases must be submitted to a factfinder. *Donaca*, 303 Or at 38.

Nonetheless, there is loose language in *Buchler* upon which one looking to resurrect a proximate cause doctrine in Oregon negligence law could seize. It is useful to read that language in its context, so I reproduce the full paragraph:

> "We decline to apply the 'facilitation' rationale of *Kimbler* * * * to this case. An intervening criminal instrumentality *caused* the harm and created the risk in that case, as in the present case. While it is generally foreseeable that criminals may commit crimes and that prisoners may escape and engage in criminal activity while at large, that level of foreseeability does not make the criminal's acts the legal responsibility of everyone who may have contributed in some way to the criminal opportunity. In other words, in our society it is foreseeable that crimes may occur and that the criminals perpetrating them may cause harm. Thus, in a general sense, it is foreseeable that anyone whose conduct may in any way facilitate the criminal in committing the crime has played some part in the resulting harm. *But mere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause harm so as to support liability for it.*"

316 Or at 511-12 (emphasis added). One way to read that paragraph is to conclude that there is some sort of doctrine in Oregon negligence law under which a defendant's liability can be limited if a "harm-producing force," distinct from the defendant's negligence, causes the plaintiff's harm. However,

such a reading would sound a retreat to the pre-*Stewart* status of Oregon negligence law. That is, it would resurrect the proximate cause doctrine.

The correct understanding of *Buchler* is as a foreseeability case. The language of the quoted paragraph simply acknowledges that a particular injury may have more than one factual cause. Two hypotheticals serve to illustrate that principle.

If I were to run a stoplight and force a vehicle with the right-of-way to slam on its brakes and stop in the middle of the intersection, and if the other vehicle, while so stopped, were to be struck by a meteorite, then injuries sustained by the vehicle's driver would have been caused by both my negligence and by the impact of the meteorite. The meteorite in this hypothetical is the "harm-producing force" that caused the other driver's injuries. Despite the fact that my negligence in running the stoplight was also a factual cause of the injuries, the risk of causing another vehicle to be struck by a meteorite as a result of my negligent driving is simply unforeseeable. In such a case, no reasonable factfinder could determine that that risk was foreseeable. Thus, it would be appropriate for a judge to dispose of such a case prior to trial.

Contrast that hypothetical with the following. If I were to negligently pack my law clerk's parachute for a skydiving adventure, and if he were to sustain injuries from his impact with the ground, then those injuries would have been caused by both my negligence and gravity. Gravity in this hypothetical is the "harm-producing force." However, it could not reasonably be argued that I should escape liability for my clerk's injuries simply because there was another "harm-producing force." Rather, I would clearly be on the hook for those injuries because it is reasonably foreseeable that a negligently packed parachute could expose someone to the risk of facing the force of gravity without the ability to resist it.

Granted, both of those hypotheticals could be resolved the same way under a proximate cause analysis. However, because a proximate cause analysis places the court in the position of lawmaker, in that the court's decision would define the scope of a defendant's liability, it is inconsistent with Oregon negligence law. Whether a particular risk

of harm is reasonably foreseeable remains a question of fact for the jury under Oregon law, except at the margins. *See, e.g., Najjar v. Safeway, Inc.*, 203 Or App 486, 492, 125 P3d 807 (2005). *Buchler* is one of those cases in the margins.

So what are we to make of *Oregon Steel Mills, Inc.*, the case on which the concurrence so heavily relies? On its face, it seems to support the concurrence's harm-producing force/proximate cause doctrine. However, that case is best understood as an anomaly and is of limited usefulness outside of cases involving securities and similar market transactions.

In *Oregon Steel Mills, Inc.*, the defendant had negligently performed some accounting work for the plaintiff that ultimately required the plaintiff to restate its earnings for 1994. As a result of a delay caused by the earnings restatement, the plaintiff was unable to make a public offering of stock and sell some additional debt at the time at which it had intended. Rather, the plaintiff was forced to enter a less favorable market one month later. Whereas its shares were selling at $16.00 per share on the date that it contended that it had intended to make the public offering, the shares were selling for only $13.50 per share on the date on which the plaintiff finally entered the market. The decline in the market was the result of a general decline in the economic fortunes of the steel industry.

The plaintiff brought a negligence action against the defendant, seeking damages of $35 million. On review, the Supreme Court held that "as a matter of law, the decline in [the] plaintiff's stock price * * * was not a 'reasonably foreseeable' consequence of [the] defendant's accounting errors, and [the] defendant therefore c[ould not] be liable for damages based on that decline." *Oregon Steel Mills, Inc.*, 336 Or at 347.

*Oregon Steel Mills, Inc.*, purports to apply the *Fazzolari* framework, but under that framework, the case cannot possibly be correct. Here's why.

In *Oregon Steel Mills, Inc.*, the Supreme Court picked up the loss-causation doctrine of federal securities law

and dropped it into Oregon negligence law, without apparently considering whether the former doctrine fit within the latter. As Judge Posner explained in *Bastian v. Petren Resources Corp.*, 892 F2d 680, 683 (7th Cir 1990), "what securities lawyers call 'loss causation' is the standard common law fraud rule * * *, merely borrowed for use in federal securities fraud cases." *See also LHLC Corp. v. Cluett, Peabody & Co., Inc.*, 842 F2d 928, 931 (7th Cir 1988) (explaining that "[l]oss causation means that the investor would not have suffered a loss if the facts were what he believed them to be" and noting that the term is "ungainly to start with because [it] conscript[s a] noun[ ] for service as [an] adjective[ ]"). That is, in order to recover for losses in the market alleged to be the result of fraud, a plaintiff must prove that the fraud caused the decline in market value. It is not surprising "[g]iven the common-law roots of the securities fraud action," *Dura Pharmaceuticals, Inc. v. Broudo*, 544 US 336, 344, 125 S Ct 1627, 161 L Ed 2d 577 (2005)—that the "loss causation doctrine" tracks the requirement in common-law fraud that the plaintiff prove proximate cause. *See, e.g., Emerging Capital Inv. v. Stonepath Group, Inc.*, 343 F3d 189, 197 (2d Cir 2003) (noting the similarity between "loss causation" and "proximate cause element of common law fraud"). The loss-causation requirement in federal securities fraud cases initially drew from the principles underlying the federal securities statutes, and in 1995 was explicitly codified in those statutes. *See* 15 USC § 78u-4(b)(4) (2000 & Supp IV 2005) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages.").

Federal courts have not hesitated to apply the loss-causation doctrine from federal securities fraud law to state negligence cases within their diversity jurisdiction. *See, e.g., Movitz v. First Nat. Bank of Chicago*, 148 F3d 760, 763-64 (7th Cir 1998) (applying the loss-causation doctrine to a negligence case arising under Illinois law in which a plaintiff sought damages from the bank that had advised him in a real estate transaction). That makes sense to a certain extent with respect to states—such as Illinois in *Movitz*—that retain the traditional negligence analysis in which proximate cause

is an element.[2] And if one were inclined to import the loss-causation doctrine into intentional fraud law in Oregon, it would fit nicely within the established elements of that intentional tort. *See Estate of Michelle Schwarz v. Philip Morris Inc.*, 206 Or App 20, 38-39, 135 P3d 409 (2006) (defining the elements of common-law fraud to include "consequent and proximate injury").

However, incorporating the loss-causation doctrine into Oregon negligence law—to which proximate cause is an anathema—cannot be done without doing violence to both the *Fazzolari* trilogy and *Stewart*. Despite the court's insistence that it was applying the "reasonably foreseeable" test, the result in *Oregon Steel Mills, Inc.*, cannot be seen as anything other than a policy call made on the basis of proximate cause.[3]

---

[2] On the other hand, the incorporation of the loss-causation doctrine into negligence law makes little sense to the extent that it requires the plaintiff to prove that the defendant's negligence was the direct cause of a decline in the market. Negligent acts will rarely, if ever, be of such significance as to rattle an entire market.

[3] The loss-causation cases on which *Oregon Steel Mills, Inc.*, relied are cases in which the plaintiffs had chosen to be in markets that, by their nature, fluctuate in response to market conditions. Because the plaintiffs had chosen to be in markets of that kind, the risk of loss in the markets was theirs unless the defendants' actions affected the markets. That makes sense when the defendants' actions did not alter the fact that the plaintiffs had chosen to be in markets that fluctuated independently of the defendants' actions, and nothing that the defendants said or did altered the fact that the plaintiffs had knowingly chosen to be in such markets. Hence, losses sustained by the plaintiffs as a result of market changes could be recovered as damages only to the extent that the market changes were caused by the defendants' conduct.

In *Oregon Steel Mills, Inc.*, however, the plaintiff was not in the market, and it was not seeking damages that it had sustained in the market. Rather, it was seeking damages from the defendant for conduct that had affected the plaintiff's ability to sell stock and debt in the market. It was reasonably foreseeable that the defendant's negligent conduct could affect the plaintiff's ability to enter the market to take advantage of favorable market conditions, yet the court held that the defendant was not liable for the reasonably foreseeable consequences of the defendant's conduct unless its conduct affected the market. That is equivalent to saying that I could not be liable for the reasonably foreseeable injuries sustained by my law clerk as a result of his use of the parachute that I had negligently packed unless my negligent conduct affected the force of gravity. Nevertheless, as a matter of policy, one could decide that, to the extent that the plaintiff sought to be in a market, it is the plaintiff that should bear the risk of market fluctuations, even when the defendant's actions affected the plaintiff's ability to enter and leave the market. Although that may be a sensible policy choice, the adoption of it in *Oregon Steel Mills, Inc.*, cannot be reconciled with the principles established in *Stewart, Fazzolari*, and *Buchler* regarding the role of courts in making policy choices that affect a defendant's liability to a plaintiff.

The court acknowledged in *Oregon Steel Mills, Inc.*, that market fluctuations are foreseeable. Most everyone is familiar with the adage, "Buy low; sell high." Certainly a reasonable factfinder could determine that a professional's negligence might cause its client to buy high or sell low. For example, a stockbroker could negligently fail to sell stock in a bear market that the broker's client had directed the broker authority to sell in such a market. The loss caused by the broker's negligence would be reasonably foreseeable, but, under *Oregon Steel Mills, Inc.*, the broker would not be liable for the loss because the fall in the market would be said to be the harm-producing force. Thus, the apparent consequence of *Oregon Steel Mills, Inc.*, is to insulate professionals from liability for the reasonably foreseeable consequences of their negligent actions, to the extent that their actions affect whether and when their clients enter and leave securities and similar markets.

This court made a similar policy decision in *Granewich v. Harding*, 150 Or App 34, 945 P2d 1067 (1997), *rev'd in part*, 329 Or 47, 985 P2d 788 (1999). In that case, a majority of this court held that an attorney cannot be liable for aiding and abetting his or her client's breach of a fiduciary duty to a third person in the absence of a fiduciary duty between the attorney and the third person. *Id.* at 48. That holding was motivated, in part, by the majority's concerns about the effect on law practice if the court were to hold the defendant attorneys liable. *Id.* at 46-47.

On review, the Supreme Court correctly reversed this court. *Granewich v. Harding*, 329 Or 47, 985 P2d 788 (1999). The Supreme Court resisted the temptation to make a policy call based on the status of the defendants, concluding that the main tort principle at issue in the case "readily

---

Furthermore, by making that policy choice, the court made it unnecessary for professionals such as accountants and lawyers to negotiate agreements with their clients to insulate themselves from the foreseeable consequences of their negligent performance of professional services that affect market transactions by their clients. Normally, parties have to enter agreements that relieve themselves from the foreseeable consequences of their negligence in order achieve that protection. Ironically, by making the policy choice that it did, the court interfered in the normal market process by which professionals, clients, and their insurers make choices about the cost and consequences of the services that the professionals provide to clients that are involved in market transactions.

extends to lawyers" and that the defendants' "status as lawyers is irrelevant." *Id.* at 56, 59. It appears that, in *Oregon Steel Mills, Inc.*, the court's resolve was not as strong.

Nonetheless, *Oregon Steel Mills, Inc.*, is the law of Oregon. Yet to stretch it to the extent that the concurrence does in this case is to conclude that it overruled *Stewart* and *Fazzolari*, notwithstanding the fact that it cited both cases favorably. Correctly understood, *Oregon Steel Mills, Inc.*, stands for the proposition that, *in the realm of securities and similar market transactions*, it is not reasonably foreseeable that a professional's negligence could cause his or her client to incur losses that result from market changes. To ingenuously seize the phrase "harm-producing force" from *Oregon Steel Mills, Inc.*—despite its genesis in *Buchler*—and assert that it means anything other than superseding cause is untenable.

That does not mean that plaintiff's negligence claim against May Trucking must ultimately be submitted to a jury. It may develop on a motion for summary judgment or at trial that May's negligence in maintaining the truck axle did not cause the axle to fail or that, given the nature of the axle failure, it was not reasonably foreseeable that subsequent owners of the truck would fail to recognize and correct the problem that caused the failure. However, those are not issues that can be resolved at the Rule 21 stage of this case.

Based on the foregoing understanding of Oregon negligence law, I cannot join the concurrence in its policy-making journey. Plaintiff's complaint stated a claim for negligence under Oregon law, and the trial court erred in concluding otherwise. The proper disposition of this appeal is reversal and remand. Therefore, I respectfully dissent.

**ROSENBLUM, J.,** dissenting.

In *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 17, 734 P2d 1326 (1987), the Supreme Court held that, absent a special relationship between the parties, "the issue of liability for harm actually resulting from defendant's conduct properly depends on whether that conduct unreasonably created a foreseeable risk to a protected interest of the kind of harm that befell the plaintiff." The complaint in this

case alleges that defendant negligently maintained the axle on its truck and that, as a result of that negligence, the axle broke and caused an accident in which plaintiff was injured. In my view, that is all that is required to state a claim for negligence under the principles announced in *Fazzolari*. Therefore, I respectfully dissent.

To reach its conclusion that the complaint in this case fails to state a claim, the concurring opinion relies on *Buchler v. Oregon Corrections Div.*, 316 Or 499, 853 P2d 798 (1993), and *Oregon Steel Mills, Inc. v. Coopers & Lybrand, LLP*, 336 Or 329, 83 P3d 322 (2004). Those cases do not support the concurring opinion's position. In those cases, the Supreme Court clarified that "foreseeability" under *Fazzolari* means *reasonable* foreseeability and concluded that, under the facts of those two cases, no rational factfinder could conclude that the harms alleged were the reasonably foreseeable consequence of the defendants' respective negligence. Although the court in each of those cases used language regarding an "unintended adverse result" and an intervening "harm-producing force," *Buchler*, 316 Or at 511-12; *Oregon Steel Mills, Inc.*, 336 Or at 345, the holdings were driven by the fact that the defendants in those cases had no reason to foresee the particular types of harms for which the plaintiffs sought to recover.

At issue in *Buchler* was whether a defendant who left keys in a van outside a prison could be liable for the murder of a woman who was killed two days later after a prisoner used the van to escape. The court said no. It stressed that there were "no claimed facts showing defendant's knowledge of unreasonable risk of danger to the particular plaintiffs involved." 316 Or at 511. It also stressed that the defendant had no reason to know that the prisoner was dangerous and so could not reasonably foresee the type of harm that befell the plaintiff. *Id.* at 507. Therefore, as a matter of law, the defendant's conduct did not create an unreasonable risk of reasonably foreseeable harm.

The court followed *Buchler* in *Oregon Steel Mills, Inc.* There, the defendant negligently performed some accounting services and, as a result, the plaintiff missed the

date on which it had planned to make an initial public offering (IPO). 336 Or at 333. Although the stock market was at the same level on the date when the defendant discovered its accounting error as it was when the plaintiff actually made its public offering, the market had risen in between those times—that is, the market had been higher on the date that the plaintiff had planned to make the IPO. The plaintiff sought to recover the difference between the profits that it would have made had it made its public offering on the date originally contemplated and the profits that it actually made from making its public offering one month later. *Id.*

The Supreme Court concluded that the defendant was not liable for that loss. The court stressed that, although it is foreseeable that stock prices will fluctuate, "no one could foresee, at the time of defendant's accounting errors in 1994 and early 1995, the risk that plaintiff would suffer a loss because its securities would be sold at market-determined prices on June 13, 1996, rather than on May 2, 1996." *Id.* at 344. The court also stressed that, even if the plaintiff had been attempting to capitalize on favorable market conditions by making its public offering on the planned date, the defendant had no reason to know of that and, indeed, knew of the planned IPO "only in the most general sense at the time of [its] wrongful conduct." *Id.* at 346. The court stated that,

> "[f]or plaintiff to have been harmed because the offering was delayed too long after the release of the favorable earnings report, plaintiff would have to present evidence that defendant knew or should have known that plaintiff's stock would have risen briefly after the release of the earnings report and then fallen back to its post-release level."

*Id.* at 346-47. Thus, the court held that "[a]s a matter of law, the risk of a decline in plaintiff's stock price in June 1996 was not a reasonably foreseeable consequence of defendant's negligent acts in 1994 and early 1995." *Id.* at 345.

In this case, the harm alleged is exactly the type of harm that a person would expect to be caused by defendant's negligence: the complaint alleges that a truck axle negligently maintained by defendant broke off and caused an accident that resulted in the injuries for which plaintiff seeks to recover. Thus, this is not a case like *Buchler* or *Oregon Steel*

*Mills, Inc.*, in which the plaintiff alleged a type of harm that the defendant had no reason to foresee. Instead, a rational factfinder could find that the harm alleged in this case was reasonably foreseeable. Because that is all that is required for a pleading to pass muster at the Rule 21 phase, dismissal of plaintiff's complaint was improper.

Accordingly, I respectfully dissent.

Haselton, Armstrong, Wollheim, and Schuman, JJ., join in this dissent.